# Cases

# FIRST DEPARTMENT

AT

# GENERAL TERM,

## March, 1888.

---

THE COMMERCIAL TELEGRAM COMPANY, Appellant, *v.* JAMES D. SMITH, as President of the New York Stock Exchange, and Others, Respondents.

*Contract made by correspondence — when such correspondence will be considered as merely preliminary to the contract — when as constituting a complete contract.*

In an action, brought to restrain the defendants from interfering with the plaintiff in collecting upon the floor of the New York Stock Exchange the quotations of dealings in stock, and distributing such quotations to its customers, it appeared that the plaintiff had applied to the New York Stock Exchange requesting " permission to put our reporters on the floor of your Exchange for the purpose of obtaining the quotations of the various stocks, and generally to enjoy the same privileges now accorded to the Gold and Stock Telegraph Company, subject to your usual rules and regulations."

That, after certain conferences between the officers of the parties to this action, a reply was made by the New York Stock Exchange to such application as follows: " I am instructed to forward to you the following plan adopted by the governing committee, which will form the basis of an agreement with you in the matter of your proposed service upon the floor of the Exchange," this was followed by various rules and regulations under which the plaintiff was to act in the premises, including the provision that an annual rent should be paid by it monthly in advance, but containing no provision as to the time during which the plaintiff should enjoy the privileges thereby conferred. The plaintiff replied to this communication " that the plan set forth in your letter is entirely satisfactory to this company; that we accept the same, and are ready to execute an agreement upon the basis proposed whenever prepared and submitted to us."

*Held,* that a claim upon the part of the plaintiff that these communications con-
tained an entire contract, and that, upon the acceptance of the terms proposed in
the defendant's communication by the last-mentioned letter of the plaintiff, a
contract was made binding on both parties, was not maintainable.

That it appeared, from the nature of the correspondence, that such correspondence
related only to the settlement of the preliminaries of a more formal contract; that it
was the evident intention of the parties that these preliminaries should be reduced
to the form of such more formal agreement, to be executed by the parties when
the proffer of these preliminaries on the one part and the acceptance of them on
the other had taken place, and that, in themselves, they did not constitute a
contract binding between the parties.

That a claim made by the plaintiff that the Stock Exchange had no right to exclude
the Commercial Telegram Company from its floor, upon the ground of public
policy, was also erroneous, especially in view of the fact that the Exchange was
a private voluntary association and not a corporation, nor enjoying any protec-
tion from the State other than such as is afforded to every citizen, and neither
seeking nor having any special privilege or special powers from the State.

That this case did not come within the class of cases in which corporations have
not been permitted to carry out a certain policy, on the ground that it was con-
trary to the interest of the people, as in each of such cases the party proceeded
against was a corporation which derived its right to exist from the sovereign
power of the State.

Subsequent to the correspondence above set forth, and some six months thereafter,
the plaintiff sent a communication to the defendant, in which it was stated that the
plaintiff had completed its lines in the lower districts of the city of New York, and
would be ready to begin serving the quotations from the Stock Exchange "in
accordance with the terms mentioned in your letter to us of April twenty-fifth
last, as soon as the necessary connections are made" in answer to which the
defendant sent a communication as follows: "At a meeting of the governing
committee, held this day, the following resolution was adopted, namely,
'that the Commercial Telegram Company be allowed the same privileges
upon the floor of the Exchange as are now enjoyed by the Gold and Stock
Telegraph Company, and upon the same terms.'" In reply to which, a
letter was sent by the plaintiff, as follows: "I am instructed to hand you here-
with our check for $1,500, in payment of rental for the present month of
November, and to say that we shall begin serving subscribers with quotations
this morning," to which the defendant replied: "The said check is received with
the distinct understanding that the privileges upon the floor of the Exchange,
granted to you by the governing committee, are at the option of the committee
of arrangements of this Exchange, and may be terminated at any time at the
pleasure of said committee." Thereafter the plaintiff was admitted to the floor
of the Exchange and enjoyed the same privileges as the Gold and Stock Tele-
graph Company, and upon the same terms.

Shortly before the commencement of this action, the Stock Exchange entered into
negotiations with the Western Union Telegraph Company, which was the lessee
of the Gold and Stock Telegraph Company, with the view of making an exclu-

sive contract between the Stock Exchange and the Western Union Telegraph Company, for the transaction of the business of collecting and distributing the quotations of stock at the Stock Exchange of the defendant, the result of which would be to exclude the plaintiff from the floor of the Exchange, and to prevent such exclusion this action was brought.

*Held,* that the proper construction of the correspondence between the parties to this action, under which the plaintiff was admitted to the floor of the New York Stock Exchange, was that the plaintiff was to enjoy the same privileges as those enjoyed by the Gold and Stock Telegraph Company, and that it should enjoy these privileges as long as the Gold and Stock Telegraph Company did.

That the defendant could not deprive the plaintiff of the enjoyment of these privileges while they were enjoyed by the Gold and Stock Telegraph Company, nor could the defendant sever its relations with the Gold and Stock Telegraph Company ostensibly merely, in order to afford it a pretext for the exclusion of the plaintiff from the floor of the Exchange, but before the plaintiff could be excluded therefrom, there must be a valid, solid and substantial termination of the relations between the Gold and Stock Telegraph Company and the Stock Exchange, not to be renewed under another guise.

APPEAL from a judgment in favor of the defendants, rendered at the New York Special Term, and from an order denying a motion for a new trial, and also from an order granting an extra allowance to the defendant James D. Smith, as president.

The action was brought by the Commercial Telegram Company to restrain the New York Stock Exchange from excluding the plaintiff from its premises and from making an exclusive arrangement with the Western Union Telegraph Company or the Gold and Stock Telegraph Company, for carrying on the business of gathering on the floor of the New York Stock Exchange the quotations of dealings at said exchange and the distribution thereof among its customers.

*Robert G. Ingersoll,* for the appellant.

*James C. Carter,* for the respondent, Smith.

VAN BRUNT, P. J.:

This action was brought to restrain the defendants from interfering with the right of the plaintiff to collect upon the floor or premises of the New York Stock Exchange, the quotations of dealings made at said Exchange and the distribution of said quotations to its customers. The claims of the plaintiff are founded upon a certain correspondence which took place between the officers of the defend-

ant and the officers of the plaintiff. There being no conflict of testimony, the questions which are to be determined upon this appeal arise upon the construction of the rights of the parties as derived from this correspondence.

The New York Stock Exchange is a voluntary unincorporated association organized and existing for the purpose of furnishing to its members more convenient facilities for carrying on the business of purchasing and selling, as brokers and otherwise, of bonds, stocks and other securities commonly dealt in in the stock market. For a long time prior to the organization of the plaintiff, the said Stock Exchange occupied and still occupies the building in the city of New York, in which such business of buying and selling bonds, stocks and securities is carried on, to which building the members and employees of said Stock Exchange alone, and no others, have access. On the 2d of March, 1882, and for a long time prior thereto, the Gold and Stock Telegraph Company had, under arrangement with the Stock Exchange, the privilege of the floor of the Exchange for their agents, and the right and privilege of collecting and using for sale and distribution or publication the news and reports of all such current transactions, quotations and statistics of said Stock Exchange as might be desirable for the said company to collect and transmit by the telegraphic instruments connected by wire with the said Exchange.

The plaintiff is a corporate body organized pursuant to the general laws of the State for the organization of telegraph companies, and had prior to the 2d of March, 1883, sought to obtain from the said Stock Exchange privileges similar to those enjoyed by the said Gold and Stock Telegraph Company, and on or about the said 2d of March, 1883, made written application to the Exchange in the following words :

"*March* 2, 1883.

"E. A. Drake, Esq., *Chairman Committee of Arrangements, New York Stock Exchange :*

"Dear Sir. — I am instructed by the executive committee of the Commercial Telegram Company to request permission to put our reporters on the floor of your exchange for the purpose of obtaining the quotations of the various stocks, and generally to enjoy the

same privileges now accorded to the Gold and Stock Telegraph Company, subject to your usual rules and regulations. Our instruments are now being manufactured and our working force organized, with a view to commencing operations at once. We expect to have a sufficient number of instruments ready by the middle of May to enable us to have several hundred of them in circuit for the quotations of your Exchange on June first. The great speed of our instruments, together with their reliability and simplicity, warrant us in believing that we can easily keep the recorded quotations up with the most active market, and without the annoyance and confusion incident to a 'companion instrument' or 'express ticker.'

"I inclose herewith specimens of the work done by our instruments. These specimens were printed at a rate of speed fully three times greater than that of the instruments now used for your quotations. We shall be pleased to have you or any of the members of your Exchange call and inspect the instruments which are in daily operation at our offices.

"As an earnest of our good faith in the premises, I inclose herewith our check for $1,000 on account, beginning June first next.

"Very truly yours,

"LUTHER E. SHINN,

"*Vice-President and General Manager.*"

To this application the exchange returned the following answer :

"COMMITTEE OF ARRANGEMENTS,

"NEW YORK STOCK EXCHANGE,

"NEW YORK, *March* 2, 1883.

"LUTHER E. SHINN, Esq., *Vice-President Commercial Telegram Company :*

"DEAR SIR. — Your favor of even tenor at hand, with inclosure. The subject-matter contained therein will be laid before this committee at its first regular meeting.

"Respectfully,

"GEORGE W. ELY,

"*Secretary of Com. tee.*"

Conferences were subsequently had between the officers of the defendant and those of the Stock Exchange concerning the admis-

sion of the plaintiff to the floor of the Exchange, and efforts were made by the Exchange to formulate a plan under which not only the Commercial Telegram Company, but also the Gold and Stock Telegraph Company and such other companies as might be admitted, should enjoy the privilege of collecting and distributing its quotations.    Prior to the 25th of April, 1883, the vice-president and general manager of the plaintiff, Mr. Shinn, was informed that the committee of arrangements had decided upon the form of a plan which would be submitted to the Governing Committee of the Stock Exchange and which would be sent both to the Commercial Telegram Company and the Gold and Stock Telegraph Company.    On the twenty-fifth of April, the Stock Exchange transmitted this proposed plan to the Commercial Telegram Company by letter, and about the same time sent a copy of it to the Gold and Stock Telegraph Company for its consideration.    The letter to the plaintiff was as follows:

" COMMITTEE OF ARRANGEMENTS,
" NEW YORK STOCK EXCHANGE,
" NEW YORK, *April* 25, 1883

' LUTHER E. SHINN, Esq.,
*Vice-President Commercial Telegram Company :*

" DEAR SIR.— I am instructed to forward to you the following plan, adopted by the Governing Committee, which will form the basis of an agreement with you in the matter of your proposed service upon the floor of the Exchange, viz. :

" *First.* A rental shall be paid by any telegraph company at the rate of $18,000 per annum, payable monthly in advance.

" *Second.* Two operators shall be stationed at desks (one at each end of the room, or elsewhere at the convenience of the committee). Each desk shall be connected with the office of each telegraph company by two wires, one of each of said wires to be connected to a single sounder (or repeater), so that both companies shall receive quotations simultaneously.    The other wire will be for convenience and to correct quotations.

" *Third.* Six or more collectors to be stationed around the room, to collect quotations and hand them promptly to the operators.

" *Fourth.* The salaries of said operators and collectors to be fixed and not altered except by mutual agreement, and to be paid *pro*

*rata* by the several telegraph companies to the Exchange, and by the Exchange to said operators and collectors, the Exchange reserving to itself the right to discharge them whenever necessary and to employ others.

" *Fifth.* Each telegraph company to furnish the Exchange with equal service as to instruments, and without charge, and in the event of a retirement of any company from the floor, then those (or the one) remaining to perform the entire service required.

"*Sixth.* An instrument (ticker) of each company shall be placed in the offices of its rivals, in order that each company may be assured that no favoritism is shown.

" Further information as to details can be obtained by application at this office.

" Respectfully,

" GEO. W. ELY,

" *Secretary of Committee.*"

On the following day the plaintiff answered this letter as follows:

"THE COMMERCIAL TELEGRAM COMPANY,

" EXECUTIVE OFFICES.

" EQUITABLE BUILDING, 120 BROADWAY, }
" NEW YORK, *April* 26, 1883.

" GEO. W. ELY, Esq., *Secretary Committee of Arrangements, New York Stock Exchange:*

" DEAR SIR. — Your communication of April 25th is received. I am instructed by our Executive Committee to say, in reply, that the plan set forth in your letter is entirely satisfactory to this company ; that we accept the same, and are ready to execute an agreement upon the basis proposed, whenever prepared and submitted to us.

" I am very truly yours,

" LUTHER E. SHINN,

" *Vice-Pres. and Gen. Man.*"

Before any other written communications passed between the parties other interviews took place between the officers of the Stock Exchange and those of the plaintiff, in which the latter were informed that the Gold and Stock Telegraph Company had made

objections to this plan; and the former expressed the hope that the Committee of Arrangements might be able to overcome them so that the Commercial Company might go to work. On or about the 25th of May, 1883, the plaintiff was informed that the Stock Exchange had been unable to overcome the objections of the Gold and Stock Telegraph Company.

It is claimed upon the part of the plaintiff that the letter of April twenty-fifth contained an entire contract and that upon the acceptance of its terms by the letter of April twenty-sixth of the plaintiffs, it became a complete contract binding upon both parties. It is very important to observe in this connection that although the claim is made upon the part of the appellant that these papers constitute an entire and complete contract, it is admitted upon its own points that there are exceptions as to its completeness, namely, that there is no provision as to the time it should remain in force nor as to the terms and conditions upon which it could be terminated. These deficiencies seem to have struck the counsel for the appellant, they being as they admit essential to the contract; but it is claimed that the law supplies the omission and a perpetual grant is to be inferred because the plaintiff could take a grant in perpetuity, and because the plaintiff could perpetually perform the service and because it would be of advantage to the plaintiff to have such a grant rather than one limited in duration. We know of no rule of law applicable to those cases where grants of privileges are silent as to their duration, which measures the duration of such grants by the capacity or rapacity of the grantee. The very fact of the absence of these essential elements seems to indicate beyond question that the papers under consideration, if there was no other reason, could not be interpreted as containing a contract between these parties. There is, of course, no question but that a contract may be entered into by letter, as well as in any other way, as long as the parties understand that the one is making a proposition the acceptance of which shall make a contract binding upon both parties. If, however, from the nature of the correspondence it appears that such correspondence is intended to be only the settlement of the preliminaries of a more formal contract, and that it is the intention of the parties that these preliminaries shall be reduced to the form of a more formal agreement, to be executed by the parties, then the proffer of these preliminaries on

the one part and the acceptance of them on the other by no means constitute a contract because it is the intention of the parties that something else shall be done before the proposed agreement shall become binding.

Now in the case at bar it is admitted as has already been stated, that nothing is said in regard to the time during which this proposed contract should remain in force, nor as to the terms and conditions upon which it shall be terminated, which seem to be essential elements of every contract, because no contract will be considered as a grant in perpetuity, such as is claimed upon the part of the plaintiffs in this case, unless it is plainly expressed upon the papers from which the contract is claimed, if such contract be in writing as in the case at bar.

The letter of the 25th of April, 1883, which contained the proposed plan which the Stock Exchange had formulated for the regulation and admission of these telegraph companies to the floor of the Exchange, expressly stated that the plan was to form the *basis* of an agreement, not that the plan was the tender of an agreement, which if accepted would make a complete contract, but that the plan contained the foundation of an agreement, the details of which were to be expressed in a contract subsequently to be entered into between the parties. And that this was the understanding of the plaintiffs at the time that this communication was received is amply established by the tenor of their answer of April 26, 1883. The language of which answer is as follows: " Your communication of April twenty-fifth is received. I am instructed by our Executive Committee to say in reply that the plan set forth in your letter is entirely satisfactory to this company; that we accept the same and are ready to execute an agreement upon the *basis* proposed whenever prepared and submitted to us.

Here was a clear indication upon the part of the plaintiff that it understood that this was a proposition to form the basis of a future agreement to be drawn up and executed between the parties, and that there were details necessary to be provided for which were not mentioned in the proposed plan, because the acceptance is not an agreement in the language of the proposed plan, but an agreement upon the basis of the proposed plan, such agreement to be executed whenever it was prepared and submitted to them. It seems to be,

therefore, perfectly clear that neither the Stock Exchange nor the Commercial Telegram Company understood at the time that this plan was proposed and accepted, that thereby a contract forever was entered into between the Commercial Telegram Company and the Stock Exchange, and that the latter had subjected their property to the right of the Commercial Telegram Company to enter thereupon so long as the latter company so willed. The counsel for the appellant has been compelled by the absence of the essential details of an agreement definite in form, definite in terms and definite in conditions to insist that by this incomplete instrument the plaintiff has obtained the perpetual right to remain and be upon the premises of the defendant and to make public its business, the business of a private association, notwithstanding the objection or the desire to terminate the arrangement upon the part of the defendant.

It is urged that if this is not the construction to be placed upon these letters, why did the Commercial Telegram Company go on and expend $250,000 or $300,000 in the preparation of its wires and instruments for the purpose of carrying on this business upon the floor of the Stock Exchange, all of which would be entirely useless and of no value if they were denied the privilege which they sought.

It is an old maxim that hard cases make bad law; and why the plaintiff, under these circumstances, should have gone on and made the large and extravagant expenditures which it did, having not the slightest scintilla of a right or claim as against the New York Stock Exchange, is certainly remarkable. But the fact that it has acted in this manner affords no grounds for the court to find the existence of a contract where there is no evidence of such a contract, or in placing an incumbrance upon the rights of one of the parties, which can never be removed, without any evidence to support the conclusion. The plaintiff, in making the expenditures which it did, undoubtedly did so upon the faith and hope that it would be permitted to occupy the floor of the Exchange upon the same terms as the Gold and Stock Telegraph Company. It recognized that it was in the mind of the committee of arrangements of the Stock Exchange that it would be desirable that there should be competition in the collection and distribution of their quotations, as competition would necessarily produce more correct and diligent

service; and it was in view of this desire upon the part of the Stock Exchange that the Commercial Telegram Company went on and made these expenditures upon the expectation that it would make some arrangement with the Exchange by which it should be a com petitor of the Gold and Stock Telegraph Company. If the officers who directed the affairs of the Commercial Telegram Company were sanguine beyond measure, and they have thereby fallen into difficulty, they cannot expect the court to warp the rules of law for the purpose of aiding them in their distress.

There is another point which shows that during this time the plaintiff did not believe that it had a binding contract with the Stock Exchange. It was a part and parcel of this proposed plan that all the telegraph companies who were admitted upon the floor of the Exchange should be admitted upon the same terms, that the Exchange should exercise a more strict supervision than had been done theretofore over the work done by these companies, that the Exchange, for some reason desired to alter the conditions on which the Gold and Stock Telegraph Company did its work, and that, as already stated, it was its intention to place all the companies upon the same footing. Shortly after the conclusion of the correspondence referred to the plaintiff was informed that the Gold and Stock Telegraph Company objected to the plan which the Exchange had formulated, and to which the plaintiff had assented as the basis of the agreement between them. It then knew that as long as that objection of the Gold and Stock Telegraph Company existed the plan which had been formulated by the Exchange could not be carried out, because, as already stated, the very essence of the plan was uniformity in agreement, uniformity in rights and uniformity in service. This seems to be placed beyond question by the testimony of Mr. Drake, who swears that when he told Mr. Shinn, the vice-president and general manager of the plaintiff, of the objections of the Gold and Stock Telegraph Company, he replied that he hoped the committee of arrangements would be able to overcome them so that the Commercial Telegram Company might get to work. Now if a contract had been entered into by reason of this correspondence between the Exchange and the Commercial Telegram Company, how could the objections of the Gold and Stock Telegraph Company prevent the Commercial Telegram Company

from getting to work ? It is apparent that at that time neither the officials of the Exchange nor the officials of the Commercial Telegram Company believed that any contract had been entered into. They were looking forward to a contract, trying to perfect the arrangements for a contract, trying to remove the objections of the Gold and Stock Telegraph Company to this proposed plan, but nothing had been concluded, nothing had been consummated, and all rested, still in proposition.

A large number of authorities have been cited upon the part of the appellant for the purpose of sustaining the claim of the plaintiff but they all depend upon the assumption that it was the intention of the parties that the correspondence should constitute a contract between them. As we have already seen, no contract was entered into between these parties by this correspondence, because neither party then supposed that they were entering into a contract and therefore none can be now claimed founded simply thereon ; and the question whether a right might have been conferred by letter and acceptance it is not at all necessary now to consider and determine.

The claim that the Stock Exchange has no right to exclude the Commercial Telegram Company from its floor upon the ground of public policy evidently proceeds upon an entirely erroneous theory. The Exchange is a private association ; it has the right to admit to its floor whom it pleases ; it obtained nothing from the State except that protection which the law affords to every citizen ; it has sought no special privilege and obtained no special powers. It is, therefore, just as much the master of its own business and of the method of conducting the same as any private individual within the State. It may make public the transactions which occur within its walls or it may refuse all information in respect thereto. No matter which course is pursued, so long as it violates no law it has a right to conduct its business as it pleases. In making the foregoing statement we have not overlooked the claim made by the plaintiff that the defendant is a joint-stock company or association within the meaning of the New York statutes relating to joint-stock companies, which claim is stated to be founded upon the fact that it holds real estate and that it is not a copartnership. The record in this case does not show that the Stock Exchange owns any real estate nor that it is not

a partnership. The trial court has expressly refused to find that the defendant does own real estate and has found that its organization is simply a voluntary association of its members and therefore is not a joint-stock company or association.

Neither have we lost sight of the suggestion that the effect of the statutes of the State of New York relative to joint-stock associations when read together is to give such associations all the qualities or attributes of corporations, except the right to have and use a common seal; nor of the case of *Westcott* v. *Fargo* (61 N. Y., 550), in which the court say that joint-stock corporations organized under the act of 1849 (which defendant was not) have some of the powers or privileges of corporations not possessed by individuals or partnerships. The power to sue and be sued in the name of their president being instanced as one of them.

In making these suggestions we think that both counsel and court have overlooked the fact that the legislature has been careful to guard against the assumption of corporate powers by these joint-stock associations, as is evidenced by the language of section 3 of chapter 245 of the Laws of 1854, which is as follows : " This act shall in no court be construed to give said associations any rights and privileges as corporations."

The act itself had provided that the death of any member need not work a dissolution of the association, thus taking its operations in this respect out of the rules relating to partnerships. To prevent the possible assumption of corporate powers because of this right of succession, the provision above cited was inserted showing the understanding of the legislature that up to this time, at least, these companies had not acquired any of the rights or privileges of corporations, and that it was not the intention ever to confer such powers upon them. The power to sue and be sued by the president or treasurer can no longer, even if it could be when the case cited was decided, be considered as a corporate power, as by section 1919 of the Code, such power is possessed by any partnership consisting of seven or more persons which has a president or treasurer.

A large number of cases are cited where contracts have been held contrary to public policy, and therefore void, but no case has been cited where a man has been allowed to trespass upon private property simply because, in the opinion of courts of law, a refusal

to permit such a trespass would be against public policy. In the case at bar, the plaintiff is insisting upon the exercise of a right upon the ground that the refusal of that right would be against public policy. The plaintiff is insisting that the defendants shall be compelled to contract with it, because to refuse to make a contract would be against public policy, and is not resisting the enforcement of a contract upon the ground that such contract is against public policy. It would seem that the distinction between the two classes of cases is so apparent as to need no argument.

Our attention has been called to another class of cases in which corporations have not been permitted to carry out a certain policy upon the ground that it was contrary to the interests of the people. In each one of these cases, however, the party proceeded against was a corporation which derived its right to exist from the people of the State. It derived some of the sovereign power of the people for the purpose of carrying out certain specific objects, which the organic law of the land recognized might be carried out by the formation of companies. These organizations the creatures of the people, living because of the power granted by the people, were held to be not the absolute uncontrolled masters of the powers conferred upon them, but that the people having granted some of their sovereign power to them had the right to insist that these powers should be used for the purposes for which the corporations had been organized, and that they should not be prostituted for the purposes of oppression. Cases essentially different from the one at bar. The New York Stock Exchange has asked nothing from the people of the State, except that which is granted to every citizen; it has no special privileges under the law, it has no special rights, and the people therefore have no right to interfere in the transaction of its business to any greater extent than they have in that of any individual. It will hardly be claimed, we imagine, that because a man has carried on business in a certain way for a number of years, that he has no right to change his methods.

Our attention has been called to the decision of the celebrated Chicago warehouse cases as presenting questions analogous to those now under discussion. But they were the cases of corporations and not of private individuals. They had no power to so conduct their business as that the rights of the public from whom they derived

their life, were not protected.    It seems, therefore, that there is no foundation whatever for the claim made upon the part of the plaintiff, that out of this correspondence in April, 1883, the plaintiffs acquired any rights whatever as against the New York Stock Exchange.

The next correspondence which took place between the parties to this action, commenced on the 16th of October, 1883, when the plaintiffs sent the following letter to the Stock Exchange:

"THE COMMERCIAL TELEGRAM COMPANY.

"EXECUTIVE OFFICES.

"EQUITABLE BUILDING, No. 120 BROADWAY,
    "NEW YORK, *October* 16, 1883.

"E. A. DRAKE, Esq., *Chairman Committee of Arrangements, New York Stock Exchange:*

"DEAR SIR.— Having completed our lines in the lower business district of the city and placed our printing instruments in the offices of many of your members, we shall be ready to begin serving the quotations of your Exchange in accordance with the terms mentioned in your letter to us of April twenty-fifth last, as soon as the necessary connections are made in your building.    This work and the placing of the printing instruments (or tickers) required by your committee for the use of your Exchange will require about a week.    Allowing for all necessary tests and any possible delays, we shall begin our service for your Exchange, not later than Thursday, November first.

"With first-class instruments of unequalled speed, operated by a corps of experienced and reliable employes, we propose rendering our services superior to that of any other company.

"We have on hand in reserve and ready for immediate use, a large number of 'tickers' which will enable us to meet any demand which may be made upon us for an increased service upon the shortest possible notice.

"Very truly yours,

"LUTHER E. SHINN,

"*Vice-President and General Manager.*"

And on the twenty-fourth of October, the Exchange sent the following letter to the plaintiffs:

" Secretary's Office, New York Stock Exchange,
" New York, *October* 24, 1883.

" Luther E. Shinn, Esq.,
　　　" *Vice-President Commercial Telegram Company :*

" Dear Sir.— At a meeting of the Governing Committee, held this day, the following resolution was adopted, viz.: ' That the Commercial Telegram Company be allowed the same privileges upon the floor of the Exchange, as are now enjoyed by the Gold and Stock Telegraph Company, and upon the same terms.'

　　　　　　　　　　　"Respectfully,
　　　　　　　　　　　　　" GEORGE W. ELY,
　　　　　　　　　　　　　　　　" *Secretary.*"


On the first of November the plaintiffs wrote to the Stock Exchange, as follows:

" THE COMMERCIAL TELEGRAM COMPANY,

　　　　　　" Executive Offices.

　　　" Equitable Building, No. 120 Broadway,
　　　　　　　　" New York, *November* 1, 1883. |

" E. A. Drake, Esq., *Chairman Committee of Arrangemente, New York Stock Exchange :*

" Dear Sir. — Having perfected our arrangements for reporting the quotations of your Exchange upon the terms and conditions agreed to between your Exchange and this Company, I am instructed to hand you herewith our check, $1,500, in payment of rental for the present month of November, and to say that we shall begin serving subscribers with quotations this morning.

　　　　　　　　" Very truly yours,
　　　　　　　　　"LUTHER E. SHINN,
　　　　　　　　　　" *Vice-Pres. and Gen. Man.*"

And immediately upon the receipt of this letter it was answered by the Exchange as follows:

> " Committee of Arrangements,
>
> " New York, *November* 2, 1883.

" Luther E. Shinn, Esq., *Vice-President and General Manager Commercial Telegram Company:*

" Dear Sir.—Your favor of November 1, 1883, inclosing check for $1,500 rent to December first, prox., is at hand. The said check is received with the distinct understanding that the privileges upon the floor of the Exchange, granted to you by the Governing Committee, are at the option of the committee of arrangements of this Exchange, and may be terminated at any time at the pleasure of said committee.

> " Respectfully,
>
> " GEO. W. ELY,
>
> " *Secretary.*"

And thereafter the plaintiff was admitted to the floor of the Exchange and enjoyed the same privileges as the Gold and Stock Telegraph Company, and upon the same terms. Shortly before the commencement of this action the Stock Exchange was engaged in negotiations with the Western Union Telegraph Company, the lessee of the Gold and Stock Telegraph Company, for the making of an exclusive contract between the Stock Exchange and the Western Union Telegraph Company for the transaction of the business of collecting and distributing its quotations. The result of this action would be to exclude the plaintiffs from the floor of the Exchange, and to prevent such exclusion this action was brought.

The plaintiff's counsel, in the argument submitted, claims no right whatever by reason of this subsequent correspondence; and it is a question whether the court, under these circumstances, should discuss the proposition whether any rights have been obtained by the plaintiff by reason of this subsequent correspondence which were about to be infringed by the defendant, and it would certainly not do so had not the subject been discussed by the counsel for the respondent in his points. The counsel for the appellant claims his right in perpetuity because of the correspondence in April, and

strives to demonstrate that the correspondence in October and November could in no way imperil rights which had been previously acquired.

It being clear to our minds that no rights had been acquired by the correspondence in April, even though no claim is made by appellant's counsel that any were conferred by the correspondence in October and November, we must consider the question, as it is clearly presented upon the record and is a question as to the plaintiff's rights arising from conceded facts.

. The counsel for the respondent states that it was insisted at the trial that the Exchange in granting to the plaintiff the same privileges as are enjoyed by the Gold and Stock Telegraph Company, and upon the same terms, granted it a right to remain as long as the Gold and Stock Telegraph Company, and cannot exclude it unless it at the same time excludes the Gold and Stock Telegraph Company. The learned counsel for the respondent insists that a brief consideration of the real nature of the contract between these parties will show the absurdity of this contention, and in his argument claims that if the plaintiff has obtained rights greater than a privilege from month to month, and for a month only at a time, it must have a grant in perpetuity, which grant the Gold and Stock Telegraph Company never had, and that therefore the plaintiff has acquired the privilege of collecting and distributing the quotations of the Exchange upon very different terms from those upon which a like privilege was enjoyed by the Gold and Stock Telegraph Company.

If the maintenance of this proposition led to such a result, we would have no hesitation whatever in coming to the conclusion that it could not be maintained. But we think that the learned counsel has overlooked the true purport of the proposition, and also has overlooked the circumstances under which this correspondence took place, and the deductions that might properly be drawn therefrom. Prior to the writing and receipt of the letter of October twenty-four, the officers of the Stock Exchange had induced the belief upon the part of the officers of the Commercial Telegram Company, that additional quotation service was desired by them and that their endeavor would be to place the Commercial Telegram Company and the Gold and Stock Telegraph Company upon an

equal footing, curtailing thereby some of the privileges theretofore enjoyed by the Gold and Stock Telegraph Company, and the officers of the Stock Exchange knew that for the purpose of putting themselves in a position to be able to carry on the business of a quotation telegraph company, and because of the expressed design of such officials to admit it to the floor of the Exchange, giving it the same privileges as the Gold and Stock Telegraph Company, the Commercial Telegram Company were expending large sums of money, and such officials also knew that in view of the contract made by the acceptance of the offer contained in the letter of October 24, 1883, large and additional expenditures would continue to be made, all of which would become perfectly useless if the Exchange deprived the plaintiff of the privilege of coming upon their floor, and it is in view of these facts that these letters must be construed. The plaintiff and the Gold and Stock Telegraph Company were to be the two rival quotation companies and the same privileges were to be enjoyed by each, and the plaintiff knowing full well that the Exchange must have telegraph service, may have thought that it could safely rely upon the continuance of its contract if it had the same privileges as the Gold and Stock Telegraph Company, as by expelling both companies from the floor the Exchange would be deprived of all such service. The Gold and Stock Company had refused assent to the plan and the Commercial Telegram Company was knocking at the doors of the Exchange for its promised admission, and to carry out the design of giving the plaintiff the same and all of the same privileges enjoyed by the Gold and Stock Company, the letter of October 24, 1883, was written. It is to be remembered that when this letter was sent the Gold and Stock Company were enjoying greater privileges than those contemplated by the plan proposed by the Exchange to the plaintiff, and those greater privileges then enjoyed by the Gold and Stock Company were undoubtedly to be the measure and definition of the privileges granted to the plaintiff, and the terms upon which the former company enjoyed these privileges became the definition and measure of the terms upon which the plaintiff was to enjoy its privileges, or in other words the plaintiff was to enjoy equal rights with the Gold and Stock Company, both were to be on the same footing, and consequently as long as the Gold and Stock Company enjoyed these

privileges the plaintiff was to have a like enjoyment, otherwise the two companies would not be on the same footing nor would they enjoy equal rights, and the then plain design of the Stock Exchange would be defeated.   At the time of the receipt of this letter of October twenty-fourth, the plaintiff knew that the policy of the Exchange was to maintain at least two organizations upon the floor of the Exchange in order that more correct and expeditious quotations might be made and better service rendered.   Knowing this when it received the communication from the Stock Exchange that it was to be accorded the same privileges enjoyed by the Gold and Stock Telegraph Company and upon the same terms, it had a right to believe that it was intended that as long as the Gold and Stock Company enjoyed privileges upon the floor, the same privileges should be accorded to it.   It was to stand upon precisely the same footing, and the privileges enjoyed by the Gold and Stock Company were to be those which were to be possessed by the plaintiff.   As we have seen such was undoubtedly the then intention and understanding of the Stock Exchange and in this understanding the plaintiff coincided, and thus there was a complete meeting of minds and a valid contract upon that basis sprang into existence.   It necessarily follows from this that if the plaintiff was to enjoy the same privileges as the Gold and Stock Company, then it was to have the right to enjoy those privileges as long as the Gold and Stock Company did, and it could not be deprived of them without the Stock Exchange at the same time excluded the Gold and Stock Telegraph Company from its floors.   The language must be interpreted by the circumstances which surrounded the parties at the time of its use.   The intention and purpose of the Stock Exchange must be considered as developed by the evidence, and that it intended to confer upon the plaintiff the same privileges as those enjoyed by the Gold and Stock Telegraph Company, and that it should enjoy those privileges as long as the Gold and Stock Telegraph Company, seems to be apparent, as has been above stated, from the whole history of these negotiations, even if such a construction of the correspondence was not in entire harmony with the language of the letter.   The very fact that the only objection which the astute counsel for the respondent has been able to raise against this proposition is that

it would be conferring a permanent and lasting right, which the Gold and Stock Telegraph Company did not enjoy, reinforces the construction, because no such objection exists. Within the stipulated time mentioned in the contract of the Gold and Stock Telegraph Company, the Exchange can terminate all the rights of both parties to privileges upon its floors. But it cannot, if this construction is true, expel the plaintiff from the floor while the Gold and Stock Telegraph Company enjoys its privileges, and in this question of the termination of privileges the Exchange cannot, as a pretext for the exclusion of the plaintiff, ostensibly sever the connection of the Gold and Stock Telegraph Company, but it must be a valid, solid and substantial termination of those relations, not to be renewed under another guise. If the defendants can put the plaintiff off the floor of the Exchange and allow the Gold and Stock Telegraph Company to remain, then it is apparent that the plaintiff is not granted the same privileges accorded to or enjoyed by the Gold and Stock Telegraph Company, which was the contract; but these very privileges covenanted for are denied to it. The construction stated above gives full effect to the provisions of the letter constituting the contract, and to each and every part thereof, and seems to be in entire harmony with the purposes and object which each of the parties then desired to attain, and if a different interpretation is now sought to be put upon its wording, such new version has its origin entirely in a change of policy upon the part of the Exchange, and an astute searching after means with which to effect the destruction of an inconvenient rival to the Gold and Stock Company. But it may be said that the letter of November 2, 1883, acknowledging the receipt of the $1,500 rent is inconsistent with this construction. Such hostility, however, is only apparent, and the terms of the letters are in entire harmony with the construction which has been placed upon the letter of October 24, 1883. It is not pretended that the literal language of the letter of November 2, 1883, was enforceable. It is not pretended that at any moment the committee of arrangements could terminate the rights of its plaintiff upon its floor. The most that is claimed is that it was the granting of a right from month to month, and that it might be terminated at the end of any month. This was the right which it was said that the Gold and Stock Tele

graph Company enjoyed, and, therefore, the Stock Exchange had the right to terminate the arrangement with the plaintiff at the end of any month beyond question; but that right was coupled with the necessity that it should exercise the same option as to the Gold and Stock Telegraph Company. The contract with the plaintiff might, therefore, be terminated at the end of any month by the committee of arrangements. It is true that they had to do something else besides simply notifying the plaintiff, in order to carry that option into effect. But it was, nevertheless, as valid as an option, as valid as a right which it might exercise as though it was not coupled with any condition.

The same privileges granted to the Gold and Stock Telegraph Company had been granted to the plaintiff, who had accepted the contract upon those terms; and having once granted the same privileges, having once placed the two companies upon the same footing under the plan fostered by itself, that the two companies were to work side by side, stimulating each other to more diligent exertion, upon the theory that no company should have an advantage over another, it cannot retire from the position it then occupied, and, after the plaintiff has acted upon this contract, expended its money and introduced its business, claim that it did not intend to place these two companies upon the same footing.

We think, therefore, that the Stock Exchange, in granting to the plaintiff the same privileges as are enjoyed by the Gold and Stock Telegraph Company, granted it the right to remain as long as the Gold and Stock Telegraph Company should remain, and cannot exclude it unless at the same time it exclude the Gold and Stock Telegraph Company.

The judgment should be reversed and a new trial ordered, with costs to the appellant, to abide the event.

Although this disposition of the appeal from the judgment makes it of little moment as to what becomes of the motion for a new trial, it is necessary to dispose of the appeal from the order denying motion for a new trial.

We think that this order should be affirmed, with ten dollars costs and disbursements. The requirements necessary to prevail upon such a motion do not seem to have been fulfilled.

Brady and Daniels, JJ., concurred.

Judgment reversed, new trial ordered, costs to appellant to abide event ; order denying new trial affirmed, with ten dollars costs and disbursements.